United States District Court
Eastern District of New York

1:18-cv-06409

Boubacar Sarr individually and on behalf of all others similarly situated

Plaintiff

- against -

Complaint

BEF Foods, Inc.

Defendant

The above-named plaintiff individually and on behalf of all others similarly situated, by attorneys, alleges upon information and belief, except for those allegations pertaining to plaintiff, which are based on personal knowledge:

1. BEF Foods, Inc. ("defendant") distributes, markets, labels and sells refrigerated ready-to-eat mashed potatoes under the "Bob Evans" brand (the "Products").

2. The Products are available in no fewer than the following varieties:

- Original
- Garlic
- Sour Cream & Chives
- Sweet Potatoes
- Buttermilk Red Skin
- Loaded (mix of cheeses with bacon)
- Savory Romano & Herb
- Broccoli & Cheese

3. The Products are sold to consumers by third-parties from brick-and-mortar stores and online, and available in no fewer than 6, 12, 20 24, 28 and 32-ounce packages.

4. The front labels include (i) an image of mashed potatoes, (ii) name of the variety (i.e., Original, Garlic), (iii) a color pattern corresponding to the variety (i.e., green for Sour Cream & Chives), (iv) vignettes of the ingredients or flavor distinguishing that variety, (v) "Farm-Fresh

Goodness," (vi) a picture of a traditional farm house on the slope of a hill and (vii) "Made with Real Potatoes, Milk & Butter," and (viii) a golden yellow pat of melting butter (Original variety).










5. The representations are misleading because despite the centrality of butter to their marketing and labeling, they contain butter as a *component* of an ingredient designated as "butter

blend," which also contains vegetable oils.

> Ingredients: Potatoes, Butter Blend (Milk, Butter [Cream, Salt], Soybean Oil, and/or Canola Oil, Salt, Natural Flavor, Monoglycerides), Contains Less Than 2% Of Black Pepper, Potassium Sorbate (To Maintain Freshness), Sodium Acid Pyrophosphate.

6. When consumers eat mashed potatoes, they are typically prepared or consumed with fats and oils, like butter or vegetable oils (i.e., margarine).

7. The naturally dry texture of potatoes requires a lipid ingredient to enhance their texture, viscosity, palatability and to provide lubrication in the mouth.

8. Consumers prefer butter (and dairy spreads) which do not include vegetable oils because they prefer butter's:

- unique and unduplicated taste, owing to more than 120 naturally occurring flavor compounds including methyl ketones and lactones;
- ability to enhance the texture and other qualities of (mashed) potato products;
- mouthfeel, since butter melts at a normal body temperature, while margarine has a higher melting point, resulting in a greasy aftertaste on the palate.

9. However, when purchasing and consuming defendant's Products, they do not get to make that all-important decision – choosing butter *or* vegetable oil-based lipids – and instead, they get both despite believing they will only be having butter.

10. Vegetable oils emerged to challenge butter's supremacy in the guise of margarine.

11. The rivalry between the two foods is unlike any other which has existed and has been greater than that of any other foods which could allege to be rivals – i.e., grain vs. whole grain, natural fruit vs. fruit with artificial ingredients, organic v. non-organic (conventional).[1]

[1] Margarine vs. butter: one of history's hottest rivalries?, Rivalry: TMSIDK Episode 17 – Freakonomics, Podcast, 4 June 2017, accessed 12 November 2017; J.H. Young, *"'This Greasy Counterfeit'": Butter Versus Oleomargarine in the United States Congress, 1886*, Bulletin of the History of Medicine, Fall (1979), 53.3, pp. 392-414; J. Bourdieu et al., "*That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals.* Food and History, (2007) 5(2), 247-266; Distillations Science + Culture + History, Butter vs. Margarine: one of America's most bizarre food battles, Podcast, 14 November 2017.

12. This was the battle of dairy vs. "vegetables," farm vs. city, natural v. artificial, pastoral v. urban, etc.

13. Butter is the quintessential natural and simple food, produced by churning the cream at the top of a cow's milk until the fat solidifies.

14. According to archaeologists, butter was discovered accidentally by nomadic herdsmen of the Neolithic-era, who attached sacks containing milk to their pack animals, which unknowingly was transformed into butter after days of jostling in the harsh steppes.

15. Margarine, on the other hand, was invented because of the French government's efforts to develop a lower quality and cheaper butter alternative in the late 19th century.

16. Vegetable oils are the primary ingredient in margarine, and such oils are converted from liquid to solid through hydrogenation, fractionation and interesterification, in the presence of chemical and enzymatic catalysts.

17. From the beginning of margarine and vegetable oil-based fats' introduction to the U.S., there was coordinated opposition by the dairy lobby, resulting in The Oleomargarine Act of 1886, which taxed margarine and defined butter.[2]

18. Numerous states banned the vegetable oil-derived margarine altogether, while others outlawed the practice of margarine manufacturers coloring their product yellow to fraudulently sell it as butter.[3]

19. Margarine producers fortified their product with Vitamin A to better imitate butter, "between the expensive, genuine article [butter] and its cheaper surrogate [margarine] ('artificial

[2] Geoffrey P. Miller, *Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine*, Cal. Law Review 77 (1989) (describing the rise of the dairy lobby in response to margarine's introduction to the U.S.); W. T. Mickle, *Margarine Legislation*, American Journal of Agricultural Economics (Aug. 1941).

[3] April White, *When Margarine Was Contraband*, JSTOR Daily, 24 Aug. 2017, accessed 15 October 2017; The Butter vs. Margarine Wars Sweep Vermont in 1900, New England Historical Society, accessed 10 November 2017.

butter', as it was dubbed) …The rivalry had a long history. Margarine, an industrial good, had mimicked the 'natural', time-honored butter ever since its invention in 1869."[4]

20. Even a Supreme Court Justice Judge John Marshall Harlan offered thoughts on butter and its vegetable oil-based representative, margarine, stating:

> [T]he real object of coloring oleomargarine so as to make it look like genuine butter is that it may appear to be what it is not, and thus induce unwary purchasers, who do not closely scrutinize the label upon the package in which it is contained, to buy it as and for butter produced from unadulterated milk or cream from such milk.[5]

21. To prevent this deception against consumers, several states required margarine be dyed pink, red and brown, so that consumers would not confuse it with butter.[6]

22. The Great Depression and World War II caused vegetable oil-based margarine consumption to increase, due to its lower cost, and the rationing and shortages of butter.

23. In the post-war decades, margarine consumption surpassed butter, because of its low price, convenience and public health guidance which warned against saturated fats in butter.

24. By the mid-1970s, margarine consumption was three times that of butter.

25. Gradually, scientists reassessed the harm of saturated fat (butter) and discovered that vegetable oil margarines contained even more harmful trans fats, caused by hydrogenation.

26. Additionally, scientific consensus shifted from holding fat content responsible for the epidemic of health-related issues as opposed to other food components, such as sugar.

27. This reassessment of fat – the type and amount consumed in one's diet –

---

[4] J. Bourdieu et al., "*That elusive feature of food consumption": Historical perspectives on food quality, a review and some proposals*. Food and History, (2007) 5(2), 247-266.

[5] Michael J. Pettit, *The unwary purchaser: Consumer psychology and the regulation of commerce in America*, Journal of the History of the Behavioral Sciences 43.4 (2007): 379-399.

[6] Rebecca Rupp, *The Butter Wars: When Margarine Was Pink*, National Geographic Blog – The Plate – Serving daily discussions on food (Aug. 13, 2014); see also Ruth Dupré, *"If It's Yellow, It Must be Butter": Margarine Regulation in North America Since 1886*, Journal of Econ. History, (1999).

> coincided with the country's natural food trends: guided by nutritionists' evolving consensus, consumers became suspicious of highly processed foods full of refined grains, added sugars, and, yes, vegetable oils, all of which bore little resemblance to foods found in the natural world.[7]

28. Margarine had come to epitomize an "undesirable artificiality" due to its shelf-stability and low price.

29. According to the NYU Professor of Nutrition Marion Nestle,

> Margarine has become a marker for cheap, processed, artificial, unhealthy food. The irony is hilarious. Unilever went to a lot of trouble to formulate healthy margarines, but the zeitgeist has caught up with them.[8]

30. Professor Nestle was referring to the decision by Unilever – the world's largest vegetable oil margarine producer – to sell its "spreads" division.

31. Though margarine manufacturers attempted to capture consumer enthusiasm for natural and less processed foods by *adding* butter to margarine and/or blending it with vegetable oils, consumers saw through this tactic:

> Adding a little butter to the company's margarine wasn't going to change that perception: If people want butter, they want butter.[9]

32. Presently, consumers have turned away from vegetable oils, often wondering rhetorically how "oil" is derived from vegetables.

33. In the place of vegetable oils and synthetically produced foods, there has been a resurgence of real foods like butter and even lard, since these foods are not made with artificial ingredients, preservatives or synthetic substances.[10]

34. Even commercial food industry's trade publications have recognized that consumers' affinity for butter is matched with an avoidance of its overly processed and artificial competitors,

---

[7] Amidst Natural Food Trends, Margarine Becomes Marginal, TrendSource, 18 October 2017, accessed 1 October 2018.

[8] Why the King of Margarine Wants Out, Justin Fox, Bloomberg, 6 April 2017, accessed 15 November 2017.

[9] *Id*.

[10] *Id*.

with Food Ingredients First noting:

> Consumers are also increasingly looking for natural products that taste good and they want to understand the ingredient list of their foods. Butter is as natural as it gets, made of just cream, or cream and salt – so butter offers food manufacturers the ability to have a clean, understandable ingredients list on their products.[11]

35. Food Business News echoed the pro-butter sentiment, reporting that:

> Butter is back as a growing number of consumers turn their backs to foods perceived as artificial, such as vegetable oil-based margarine. Fresh from the farm, and churned the same way for generations, butter's comeback may be attributed to its simplicity and its deliciousness.[12]

36. One food industry executive pointed out that "Butter consumption is up 25% in the last 10 years" and that "Butter is benefiting from consumers' desire for fresh, real and natural products," while demand for margarine continues to reach new depths.[13]

37. This can be seen by the ingredients used to make butter – cream, salt or both – whereas vegetable oil-based margarine and other artificial spreads contain a host of ingredients which would require a chemistry textbook to understand.[14]

38. The comments of the Director of Nutrition at the Center for Science in the Public Interest, Bonnie Liebman, on consumer perceptions of these two products were apt: "Butter has a more natural image. I think people have always been a bit suspicious about margarine."

39. According to Mintel, the leading global market research firm, part of the reason for butter consumption now exceeding its vegetable oil rivals is because 68% of consumers recognize butter as pure, natural, simple and minimally processed.[15]

40. The "butter blend" contained in the Products is a prime example, as it is declared to

---

[11] Butter: A healthy fat or fad?, Food Ingredients First, 10 April 2018, accessed 24 June 2018.
[12] Butter innovations churning retail sales, Donna Berry, Food Business News, 14 June 2016, accessed 19 September 2018.
[13] *Id*.
[14] Supra, note 7 and 8.
[15] Mintel, *Report on Butter, Margarine and Spreads – US (Aug. 2011)*; Brenda Reau, *Butter is Gaining Ground with Consumer Demand for Natural Products*, Michigan State University Extension Product Center (Sep. 15, 2011).

contain: Milk, Butter [Cream, Salt], Soybean Oil, and/or Canola Oil, Salt, Natural Flavor, Monoglycerides.

41. More significant than any difference between butter and vegetable oils over the exact number of micronutrients or grams of certain components is the desire of plaintiff and consumers to eschew artificial and synthetic foods in favor of natural and simpler ones – butter, made from cow's milk vis-à-vis vegetable oils, of vegetables of unknown origins.

42. The Products emphasize butter through the label statements, images, and representations, including the numerous uses of "farm": "farm-fresh goodness," "Our Farm Salutes," image of farm, "Farm Fresh Ideas" (side panel).

43. No reasonable consumer expects a product which emphasizes butter in these ways to also include vegetable oils.

44. After all, vegetable oils are not produced on a farm which is where butter originates, but in an industrial factory, often far from the tranquility which accompanies the rural way of life.

45. To the extent reasonable consumers consume butter *and* vegetable oils, this would only be done in separate foods (i.e., butter for baking muffins, margarine for preparing vegetables), instead of using a bit of each within the same food.

46. This is similar to how most people would prefer watching an entire movie (even a bad film) instead of seeing half of two highly regarded movies – variety is not always preferred.

47. For the purposes of the present example, vegetable oils are represented through use of the term "margarine" since it simplifies the search parameters and results.

48. These preferences are borne out by looking at how consumers eat mashed potatoes, through a review of Allrecipes.com, which has more user-contributed recipes than any other site

and is the most-visited recipe site.[16]

49. Moreover, consumers associate vegetable oils with margarine.

50. This is shown and can be replicated by visiting google.com and entering the two combinations of Search Terms 1 and 2 followed by "site:allrecipes.com/recipe," as shown below.

| Subdomain URL | Search Term 1 | Search Term 2 | Results |
|---|---|---|---|
| site:allrecipes.com/recipe | "mashed potatoes" | "butter or margarine" | 171 |
| | | "butter and margarine" | 0 |

51. When "mashed potatoes" is combined with "butter or margarine," Allrecipes.com retrieves 171 distinct, user-generated recipes which include "mashed potatoes" in the name (i.e., Whipped Mashed Potatoes, Rosemary Mashed Potatoes, etc.).

52. In contrast, where "mashed potatoes" is combined with "butter and margarine," Allrecipes.com is unable to locate a single entry.

53. This illustrates that when consumers have mashed potatoes, they will seek a version which has butter or vegetable oil-based margarine, but never both.

54. Consumers reasonably expect food manufacturers to make products in a way that is familiar and appealing to them, based upon their typical experiences making foods at home and ingredient preferences and they have responded, reformulating products to match this demand.[17]

55. This preference towards "homemade" style foods is promoted on the Products' labels through the farm-based imagery.

56. Food Navigator, another food industry publication, has reported that "that there's actually much more consumer focus on front-of-pack claims than on the ingredient list" when it

---

[16] According to the Alexa.com, the premier commercial internet traffic data firm, and eBizMBA.com, which combines data from Alexa with other similar services such as Compete and Quantcase.

[17] Survey Says Consumers Prefer Natural, Homemade Tasting Food, Natural Products Insider, 12 September 2013

comes to matching consumer preferences, quoting the director of marketing for DuPont Nutrition & Health in North America.[18]

57. Across the food industry, companies big and small have embarked on efforts to put out products which appeal to consumers seeking foods like they would make at home.

58. Natural Products Insider described what consumers expect when purchasing a product like the mashed potatoes of defendant – "[A] ready-made dish that requires simple heating takes the pressure off a busy weeknight, but for an increasing number of consumers, it also must have a *homemade character*." (emphasis added).[19]

59. Competitor refrigerated mashed potatoes of Pineland Farms, often adjacent to defendant's on grocery shelves, below, only use butter, which indicates there are no technological challenges in food processing which necessitate the use of margarine.

Front Label




Ingredients




[18] Elaine Watson, Who is driving the clean label agenda, and what does clean really mean?, Food Navigator, 9 March 2012.

[19] Cindy Hazen, Addressing Texture Challenges in Clean Label Prepared Foods, Natural Products Insider, 3 July 2018,

60. Consumers' strong preferences for butter or vegetable oil alternatives have not just been highlighted by food industry executives, but by writers, researchers and scientists of every stripe.[20]

61. One commentator described her experiences in a way which would seem familiar to Americans:

> I was hosting a dinner party for friends once, when someone asked me to pass the butter. The woman, a neighbor, hesitated for a moment, and then asked if it was butter or margarine.
>
> "Butter," I said.
>
> "Oh, good," she said.
>
> Someone else nodded in agreement. Another declared he hadn't had margarine in years.
>
> Soon the margarine-bashing began. The color: too yellow. The texture: waxy. A friend's husband went so far as to say he always knew what kind of house he was in by the butter or butter substitute they served, and those homes that served butter substitutes would not have him as guest again anytime soon. You'd think someone had mentioned taxes or lutefisk, so palpable was the disgust.[21]

62. Food scientists who have studied the usage of butter vis-à-vis vegetable oil-based margarine confirmed these strong sentiments, noting that "consumers appeared to fall primarily into two groups: butter-only consumers, and margarine + butter consumers," because margarine loyalists "often used butter for special occasions or for baking."[22]

---

[20] Nina Martyris, *Operation Margarine: Tracing the Wartime Rise of Ersatz Butter*, Harper's Magazine – Blog (May 2, 2014) (describing the intensity of reactions brought about by replacing butter with margarine and noting "Margarine thrives on adversity, and its origins are rooted in it."); Libby Copeland, *New Book Clarifies Butter's Spread and Chronicles Its Wars With Margarine*, Smithsonian.com (Nov. 21, 2016) ("For decades there's been a huge butter versus margarine debate").

[21] Paula Carter, *Margarine: A Public and Personal History*, The Rumpus, 2 August 2013, accessed 23 November 2017.

[22] A.J. Krause, *Identification of the Characteristics that Drive Consumer Liking of Butter*, Journal of Dairy Science (2007).

63. Another study came to a similar conclusion – though margarine users are open to having butter, those who prefer butter are unlikely to use margarine.[23]

64. The Products make extensive use of the term "fresh," one of the most valued descriptive terms to consumers.

65. For mashed potatoes, a reasonable consumer understands "fresh" to mean they were "just prepared."

66. This is because there must be human and mechanical intervention to convert a whole potato to the mashed form.

67. The Products are represented as "fresh," claiming "Made with Fresh Potatoes" and "farm-fresh goodness" though never actually claiming the Products *are* "fresh."

68. Rather, the Products use the term "fresh" in a manner which causes consumers to be misled, because defendant knows over 80% of consumers erroneously believe refrigerated mashed potatoes are fresh.

69. This mistaken belief is known to defendant because of proprietary research conducted by affiliated entities which manufactures and sells similar products.

70. It strains credulity that one company would carry out costly and valuable direct consumer research and not share that information with a sister company – defendant.

71. However, mass marketed refrigerated potato products such as the Products cannot be fresh because fresh mashed potatoes have a shelf-life between 7 and 10 days.

72. The Products are not fresh because their 3-month shelf life is due to artificial chemical preservatives including potassium sorbate and sodium acid pyrophosphate.

---

[23] M. Michicich, *Consumer Acceptance, Consumption and Sensory Attributes of Spreads Made from Designer Fats*, Food Quality and Preference (1999).

73. These preservatives change the essential nature of an uncomplicated food –basic mashed potatoes (what consumers want) – to an artificial product they would avoid if they knew the truth.

74. Potassium sorbate, which inhibits microbial growth, is made through adding potassium carbonate to a solution of sorbic acid in a solvent of acetone, heating the mixture to reflux temperature and recovering potassium sorbate from the reaction mixture.

75. Sodium pyrophosphate prevents and reverses naturally occurring discoloration, or "after-cooking darkening, and is made through treating phosphoric acid with a sodium compound.

76. No reasonable consumer expects that a simple, uncomplicated product like mashed potatoes, which touts as being "Made with Fresh Potatoes, Real Milk & Butter" will contain vegetable oils and artificial preservatives.

77. Excluding tax, the Products cost no less than $3.99, a premium price compared to other similar products.

Jurisdiction and Venue

78. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

79. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

80. This Court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

81. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

82. A substantial part of events and omissions giving rise to the claims occurred in this District.

Class Allegations

83. The classes consist of all consumers in the following states: all, New York who purchased any Products with actionable representations during the statutes of limitation.

84. A class action is superior to other methods for fair and efficient adjudication of this controversy.

85. The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

86. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

87. Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

88. Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

89. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

90. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

91. Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

92. Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

Parties

93. Plaintiff is a citizen of Kings County, New York.

94. Defendant is an Ohio corporation with its principal place of business in New Albany, Ohio.

95. In 2017 and/or 2018, plaintiff purchased one or more of the Products for personal consumption, for no less than $3.99 per Product, excluding tax, within this district and/or State.

96. Plaintiff paid this premium because prior to purchase, plaintiff saw and relied on the misleading representations.

New York General Business Law ("GBL") §§ 349 & 350

97. Plaintiff incorporates by references all preceding paragraphs.

98. Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

99. Defendant's representations are false, unfair, deceptive and misleading for the reasons described herein.

100. Plaintiff reasonably believed based on defendant's representations that the Products contained butter and not vegetable oils, were fresh, and did not contain artificial ingredients.

101. Defendant's representations are false, deceptive and misleading for the reasons described herein.

102. The representations and omissions were relied on by plaintiff and class members, who paid more than they would have otherwise, causing damages.

Negligent Misrepresentation

103. Plaintiff incorporates by references all preceding paragraphs.

104. Defendant misrepresented the composition of the Products (1) by highlighting butter, giving consumers the impression that they only contained butter to the exclusion of non-dairy based fat ingredients, since consumers do not use butter and vegetable oils on mashed potatoes

and (2) implying the Products were fresh, which took advantage of mistaken consumer beliefs, when the Products are not fresh.

105. Defendant had a duty to disclose and/or provide a non-deceptive description of the Products and knew or should have known same were false or misleading.

106. This duty is based, in part, on defendant's position as a trusted brand who has made homestyle fare for Americans for decades from the chain of popular restaurants with the Bob Evans name.

107. At the time of the representations, defendant knew or should have known same were false or misleading, or made them without knowledge of their truth or veracity.

108. Defendant negligently misrepresented and/or negligently omitted material facts.

109. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

110. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

<u>Breach of Express Warranty and Implied Warranty of Merchantability</u>

111. Plaintiff incorporates by references all preceding paragraphs.

112. Defendant manufactures and sells refrigerated mashed potato products.

113. Defendant warranted to plaintiff and class members that the Products did not contain non-dairy fat ingredients and were fresh when this was not truthful and was misleading.

114. Since it is not conceivable to have mashed potatoes with dairy and non-dairy lipids, no reasonable consumer would expect the Products to contain vegetable oils.

115. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

116. As a result, the Products lacked those attributes which are present in mashed potato products which contain butter to the exclusion of vegetable oils and which are fresh.

117. Plaintiff and class members relied on defendant's claims, paying more than they would have otherwise.

Fraud

118. Plaintiff incorporates by references all preceding paragraphs.

119. Defendant's intent in making the "Made with Fresh Potatoes, Real Milk & Butter" claims was to take advantage of consumers' common expectations, which do not expect mashed potatoes to have butter *and* vegetable oils and wrongly think refrigerated mashed potatoes are fresh.

120. Defendant's actions were motivated by increasing their market share amongst the many rival mashed potato companies.

121. Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have otherwise, entitling them to damages.

Unjust Enrichment

122. Plaintiff incorporates by references all preceding paragraphs.

123. Defendant obtained benefits and monies because the Products were not as represented, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of such inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE,** plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing defendant(s) to correct the practices to comply with the law;
3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and GBL claims;
4. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and
5. Such other and further relief as the Court deems just and proper.

Dated: November 11, 2018

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan (SS-8533)
891 Northern Blvd., Suite 201
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

Levin-Epstein & Associates, P.C.
Joshua Levin-Epstein
1 Penn Plaza, Suite 2527
New York, NY 10119

1:18-cv-06409
United States District Court
Eastern District of New York

---

Boubacar Sarr individually and on behalf of all others similarly situated

Plaintiff

- against -

BEF Foods, Inc.

Defendant(s)

---

# Complaint

---

Sheehan & Associates, P.C.
891 Northern Blvd., #201
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

---

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: November 11, 2018

/s/ Spencer Sheehan
Spencer Sheehan